**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TREO Vitus GP, LLC, for itself and as general partner for Invictus Special Situations Master I, L.P. | ) ) ) ) |
| *Plaintiff,* | ) ) C.A. No. _____ |
| v. | ) ) ) |
| Invictus Global Management, LLC, Invictus Special Situations I GP, LLC, Cindy Chen Delano, and Amit Patel, | ) ) ) ) |
| *Defendants.* | ) ) ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

TREO Vitus GP, LLC ("TREO GP"), for itself and as a fiduciary under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and also as general partner of Invictus Special Situations Master I, L.P. (the "Fund"), files this *Complaint for Declaratory and Injunctive Judgment* against Invictus Global Management, LLC ("IGM"), Invictus Special Situations I GP, LLC ("IGP"), Amit Patel ("Patel") and Cindy Chen Delano ("Delano" and, collectively with IGM, IGP and Patel, "Defendants"), and avers in support thereof, the following:

## I.    Introduction / Statement of the Case

1.      TREO GP files this action in its fiduciary capacity to protect ERISA benefit plan investors that invested in the Fund, and their underlying participants and beneficiaries who rely on their pensions.  Absent relief, TREO GP risks being compelled by the Delaware Court of Chancery to transfer millions of pensioners' dollars to the Fund's insolvent former managers in violation of ERISA.  TREO GP needs declaratory and injunctive relief from this Federal District Court because the Court of Chancery declined to determine TREO GP's ERISA affirmative defense in a pending

action between the parties, and ruled that such defense was preserved and must be raised in federal court.

2.     This case concerns an ongoing dispute between the Fund and its previous management.  On September 29, 2023, a supermajority of the Fund's limited partners removed IGP as the Fund's general partner and terminated the Fund's management agreement with IGM. TREO GP and TREO Asset Management, LLC ("TREO AM"), were then appointed to serve as the replacement general partner and investment manager of the Fund, respectively.

3.     Spiteful at having been removed, and believing they would be entitled to advancement even for post-removal conduct, Defendants ignored their post-removal contractual and ERISA fiduciary obligations and instead decided to hold the Fund hostage.[1]  Defendants first refused to return the Fund's property, including over $9 million that Defendants had siphoned into an IGM bank account (several million of which Defendants did not even disclose was in their possession).  Even more challenging, Defendants steadfastly refused to meet their post-removal contractual obligations, including to provide access to information books and records related to their management of the Fund.  After leaving TREO GP effectively no other option than to pursue legal action to enforce the Fund's unequivocal rights, Defendants then claimed a right to advancement and engaged in litigation misconduct designed to waste the Fund's resources and obstruct TREO GP's efforts to protect the Fund's investors.  Based on Defendants' history of vexatious litigation, it appears that these malicious tactics were designed to extract a nuisance

---

[1]     Because Defendants maintained dominion and control over more than $9 million of the Fund's ERISA benefit plan investors' assets, they continued to be ERISA fiduciaries post-removal.

settlement from the Fund.  But TREO GP persisted and prevailed on the merits, and Defendants were repeatedly admonished by the Court of Chancery for their tactics.[2]

4.      After ruling on the merits of TREO GP's affirmative claims (other than damages, which has not yet been addressed), however, the Court of Chancery took up Defendants' advancement counterclaims on summary judgment.  TREO GP argued that, under both the terms of the applicable contracts and ERISA, the Fund was prohibited from paying advancement.  With respect to the latter, TREO GP argued that ERISA prohibited advancement from the Fund as a matter of law, under Third Circuit case law generally prohibiting advancement to ERISA fiduciaries as well as on the facts and circumstances of the case that separately require denial of advancement under ERISA.

5.      The Court of Chancery, however, in a bench ruling on September 9, 2024,[3] ruled solely as a matter of Delaware law that Delano (and likely the other Defendants) was entitled to advancement, but declined to consider TREO GP's ERISA defense, saying that such defense was "preserved."  On November 15, 2024, the Court of Chancery declined to change its ruling in connection with TREO GP's subsequent motion for reargument.[4]

6.      Implementing this ruling before the ERISA defense can be addressed, however, would not only strip the Fund of its ERISA defense without due process, but would require TREO GP to breach its own ERISA fiduciary duty because TREO GP manages ERISA plan assets for the Fund and is thus prohibited under ERISA from advancing legal fees to its former managers under these circumstances.

---

[2]      Copies of the applicable hearing transcripts are submitted herewith and discussed below.

[3]      A copy of the September 9 bench ruling is attached at Exhibit A.

[4]      A copy of the November 15 reargument ruling is attached as Exhibit B.

7.      In its rulings, the Court of Chancery told TREO GP that if it wanted a ruling on the preserved ERISA defense, it needed to go to federal court. This action follows.

## II.    Jurisdiction and Venue

8.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331.

9.      Venue is appropriate in this Court under 28 U.S.C. § 11391(b).

## III.    Parties

10.     The Fund is a Cayman Islands exempted limited partnership, and acts through its general partner, TREO GP, a Delaware limited liability company.

11.     IGM is a Delaware limited liability company headquartered in Austin, Texas and is owned by Patel and Delano.

12.     IGP is a Delaware limited liability company headquartered in Austin, Texas and is owned by Patel and Delano.

13.     Amit Patel is an individual and, on information and belief, resides in Texas.

14.     Cindy Chen Delano is an individual and, on information and belief, resides in Minnesota.

## IV.    Facts

### A. *Governance of the Fund Prior to September 29, 2023*

15.     The Fund is a privately held investment fund, focusing on distressed credit, bankruptcy creditor and trade claims, litigation finance opportunities, and post-reorganization equity.

16.     Until September 29, 2023, IGP was the general partner of the Fund under that certain *First Amended and Restated Limited Partnership Fund Agreement*, dated August 25, 2020 (the "LPA"). A copy of the LPA is attached hereto as Exhibit C.

4

17.     Until September 29, 2023, IGM was the contractually appointed investment manager of the Fund, under that certain *Investment Management Agreement* (the "IMA") between the Fund and IGM. A copy of the IMA is attached hereto as <u>Exhibit D</u>.

18.     Through their ownership and control of IGP and IGM, Patel and Delano managed and controlled the Fund and its investments until September 29, 2023.

19.     The Fund was originally seeded by Corbin ERISA Opportunity Fund, Ltd., Corbin Opportunity Fund, L.P., Corbin Private Creditor Manager Fund, L.P., and New York State Nurses Association Pension Plan (collectively, "Corbin") and Gatewood Opportunity Fund (Cayman), L.P. ("Gatewood"). The Corbin ERISA Opportunity Fund, Ltd. and the New York State Nurses Association Pension Plan are qualified benefit plan investors and governed by ERISA's strict fiduciary requirements.

20.     More than 25% of the amounts invested in the Fund derive from qualified ERISA benefit plan investors.

21.     On or about October 2021, Defendants knowingly and expressly accepted their roles as ERISA investment fiduciaries, by executing an acknowledgment under Section 3(38) of ERISA that IGM was being appointed as an ERISA fiduciary for certain Corbin ERISA Assets. The acknowledgment was executed by Delano on behalf of IGM. A copy of the Section 3(38) acknowledgment is attached hereto as <u>Exhibit E</u>.

### B. The Removal

22.     On September 29, 2023, Corbin and Gatewood, constituting a supermajority of the Fund's investors, removed IGP as general partner of the Fund pursuant to the removal provisions of the LPA and terminated the IMA (collectively, the "Removal").

23.    Upon Removal, Defendants ceased to be "Indemnified Persons" as defined in the LPA and were thus not entitled to advancement of fees with respect to post-Removal conduct. Indeed, section 3.09 of the LPA, discussing the obligations of a *former* general partner, expressly provides that "the General partner shall continue to be indemnified in accordance with **Section 3.03** with respect to the activities of the Partnership *prior to such removal*." LPA, §3.09 (emphasis added).

24.    Contemporaneously with the Removal, Corbin and Gatewood appointed TREO GP as the replacement general partner of the Fund, and the Fund entered into a new management agreement under which TREO AM was appointed as the new investment manager of the Fund.

### C. *Defendants' Refusal to Cooperate in the Transition of Management*

25.    Upon being appointed as the replacement general partner and investment manager of the Fund, TREO GP sent information and document requests to the Defendants in an effort to facilitate a smooth transition of management of the Fund and requested that IGM identify and return any other property of the Fund in its possession.

26.    Defendants provided limited information and documents to TREO GP, but generally refused to cooperate.

27.    At the time of the Removal, Defendants held approximately $12.1 million in an IGM bank account. Those monies belonged either to the Fund or its investment vehicle, UnumX, a special purpose Cayman entity formed by the Defendants and owned by the Fund to hold assets related to one of the Fund's investments. Approximately $6.9 million of the funds in the IGM bank account were owned by UnumX.

28.    Upon learning that IGM held UnumX's money in its bank account, TREO GP requested that IGM return the money to UnumX. After an initial delay, Defendants returned

approximately $2.9 million, but refused to return the remaining $4 million (the "UnumX Proceeds"), initially asserting an intent to use the balance to create an "indemnity reserve" and later claiming that some of the retained money would be paid to reimburse already incurred professional fees, reflecting IGM's continuing intent to manage and control the Fund's property after being removed.

29.    TREO GP subsequently learned, through its own forensic investigation, that IGM was holding an additional approximately $5.2 million in the IGM bank account that derived from a separate investment of the Fund (the "Tuesday Morning Proceeds" and, collectively with the UnumX Proceeds, the "Retained Funds").

30.    TREO GP similarly requested that the Tuesday Morning Proceeds be returned to the Fund, but Defendants refused, instead asserting that such funds should be used to pay unpaid expenses incurred by IGM, yet again demonstrating IGM's attempts to exert post-Removal control over the Fund's property.

### D. The First Fund Action

31.    On October 13, 2023, the Fund, acting through TREO GP, and UnumX (collectively, the "Fund Parties") commenced an adversary proceeding in the Delaware Bankruptcy Court against IGM, Delano and Patel (the "First Fund Action"). A copy of the adversary proceeding complaint is attached as Exhibit F.

32.    Through the First Fund Action, the Fund Parties sought: (1) a declaratory judgment that the UnumX proceeds were owned by UnumX and that IGM was not authorized to retain and withhold the UnumX proceeds under various orders entered by the Delaware Bankruptcy Court in the DeCurtis bankruptcy case, and (2) injunctive relief prohibiting the defendants from using the UnumX Proceeds and compelling the return of the UnumX Proceeds to UnumX.

33.     At an initial hearing, the Delaware Bankruptcy Court concluded that it lacked subject matter jurisdiction to consider the relief requested, and the First Fund Action was dismissed on October 31, 2023.  While counsel appeared at the hearing on October 17, 2023, defendants did not file any pleadings in the case.

34.     Following the commencement of the First Fund Action, Defendants continued to refuse to provide information, books and records to TREO GP, and continued to refuse to return the UnumX Proceeds.

### E.  The Chancery Action

35.     On October 30, 2023, the Fund, acting through TREO GP, commenced suit against Defendants in the Delaware Court of Chancery, C.A. NO. 2023-1099-NAC (Del. Ct. Ch.) (the "Chancery Action").

36.     In the Chancery Action, TREO GP similarly sought declaratory and injunctive relief regarding the UnumX Proceeds, and similar relief regarding the Tuesday Morning Proceeds. TREO GP also sought turnover of any books and records of the Fund in Defendants' possession, as well as specific performance of Defendants' post-removal contractual obligations under section 7 of the IMA, which requires IGM to provide the Fund with access to information, books and records of IGM that relate to management of the Fund and the Fund's investments.  The complaint also asserts claims for reformation of contracts, accounting, equitable trust and damages.  A copy of the verified complaint is attached hereto as Exhibit G.

37.     The Court of Chancery held initial hearings on November 6, 2023, and November 8, 2023, and the parties agreed to a status quo order, freezing the IGM bank account holding the Retained Funds.

38.     At the November 8 hearing, Defendants told the Court of Chancery that they intended to file counterclaims for advancement of their legal fees and that they intended to turn over all requested information, books and records to render those claims moot.  In particular, counsel for Defendants stated that "we are going to continue working with them collaboratively to give them everything that they are entitled to that doesn't affect third-party substantive rights. . . . So as an officer of the Court, we're committed to doing that, and we're going to start immediately."[5]

39.     The Court of Chancery scheduled an expedited trial for early January 2024, based in part on the Defendants' representations that they would provide information, books and records cooperatively.  Specifically, the Court of Chancery noted that "it's also important to consider that defendants have represented to me on multiple occasions, both during this hearing and during our prior hearing, that defendants are taking very active steps and will take very active steps to provide and facilitate access to nearly all of the information that the plaintiffs are requesting."[6]

### a.   The Advancement Counterclaims

40.     On November 17, 2023, Defendants answered the complaint and filed counterclaims against the Fund and a third-party complaint against UnumX (collectively, the "Counterclaims"), through which they sought fee advancement with respect to the First Fund Action, the Chancery Action, and separate litigation that was then pending in the bankruptcy court (the "Foreclosure Litigation").  A copy of the Counterclaims is attached hereto as Exhibit I.

---

[5]     Transcript, Nov. 8, 2023, 23:2-10.  A copy of the November 8 transcript is attached hereto as Exhibit H.

[6]     *Id.*, at 31:1-7.

41.     With respect to the Foreclosure Litigation, Defendants asserted that the Fund was obligated to advance Defendants' fees under the fee advancement provisions of the LPA and the IMA, and that UnumX was obligated to advance fees incurred by Patel and Delano as directors of UnumX under UnumX's Memorandum and Articles of Association (the "UnumX Articles").

42.     With respect to the First Fund Action, Defendants asserted that the Fund was obligated to advance fees incurred by IGM, Patel and Delano under the LPA and the IMA.  The Counterclaims did not assert entitlement to advancement from UnumX with respect to the First Fund Action.

43.     With respect to the Chancery Action, Defendants asserted that the Fund was obligated to advance fees incurred by Defendants under the LPA and the IMA. The Counterclaims did not assert entitlement to advancement from UnumX with respect to the Chancery Action.

### b.  ERISA Defense, Removal to this Court and Remand

44.     The Fund Parties collectively answered the Counterclaims on December 7, 2023, and asserted an affirmative defense that Defendants' claims for fee advancement were precluded by ERISA.  A copy of the answer to the Counterclaims is attached hereto as Exhibit J.

45.     Pretrial discovery disputes resulted in the Fund Parties filing a motion to compel, on which the Court of Chancery held a hearing on January 4, 2024.  During that hearing, TREO GP argued that ERISA either (a) provides a blanket prohibition against all advancement from ERISA plan assets under applicable case law from the Third Circuit, or (b) requires factual determinations of whether Defendants had breached their ERISA fiduciary duties.  TREO GP asserted that, while ERISA was not implicated in TREO GP's affirmative claims in its complaint, TREO GP was entitled to take appropriate discovery in support of its ERISA affirmative defense, because the January trial was to include Defendants' advancement Counterclaims.

46.     While not asserted in TREO GP's affirmative claims in the Chancery Action, Defendants' conduct both before and after removal reflects patent breaches of Defendants' fiduciary duties under ERISA, including (a) intercepting and retaining the UnumX Proceeds and the Tuesday Morning Proceeds, (b) causing the Fund to enter into prohibited conflicted transactions without LPAC consent, (c) diverting Fund resources and corporate opportunities to entities outside the Fund ownership structure, (d) incurring excessive and unreasonable fees, including for legal and consulting services, (e) breaching investment concentration limits, (f) causing the Fund to pay expenses unrelated to the Fund, and (g) failing to offset management fees by additional work fees received by IGM.

47.     At the conclusion of the January 4 hearing, the Court of Chancery bifurcated the trial, so that it would only proceed as to the claims for information, books and records. The Court of Chancery noted that it had relied on the Defendants' representations that they would voluntarily turn over information, books and records, which had not happened. Accordingly, as a result of Defendants' conduct, the January trial would no longer include the claims to recover the Retained Funds or the advancement Counterclaims. For example, the Court of Chancery noted that "I must say, given the representations that Mr. Glenn made to me at the prior hearing in this matter, I frankly would have expected Mr. Glenn to be making the argument to me and explaining why it is that the information requests were not mooted out or almost entirely mooted out, as I had understood would be the case based on what he very – as I understand it – directly represented to me."[7]

---

[7]     Transcript, Jan. 4, 2024, at 34:3-10. A copy of the transcript from the January 4 hearing is attached hereto as Exhibit K.

48.    On January 6, 2024, just hours before trial was scheduled to commence, Defendants removed the Chancery Action to this Court, asserting that issues of ERISA created federal jurisdiction.

49.    The Fund Parties promptly moved to remand, arguing, *inter alia*, that ERISA was only asserted as a *defense to the Counterclaims*, and that removal jurisdiction required that a federal question be evident from the face of the plaintiffs' complaint.

50.    On January 12, 2024, just 3 days after the remand motion was filed, this Court issued an opinion and order remanding the case to the Court of Chancery. In so doing, this Court noted *both* that removal was untimely *and* that removal was inappropriate because there were no federal claims asserted in TREO GP's complaint, including under ERISA. This Court also noted that a federal defense does not create federal jurisdiction or a basis for removal. A copy of the remand opinion is attached hereto as Exhibit L.

### c.    Books and Records Judgment

51.    The Defendants' improper removal, even though quickly remanded, resulted in the January trial being delayed, and trial was rescheduled for February 6, 2024.

52.    On February 5, 2024, just one day before the rescheduled trial, Defendants filed a letter withdrawing all of their legal defenses to the claims for information, books and records. With their legal defenses withdrawn, trial was held on February 6, 2024.[8]

53.    On April 17, 2024, the Court of Chancery issued its findings of fact and conclusions of law following the trial, and entered judgment in favor of TREO GP on Counts I, IV and VI of

---

[8]    Defendants attempted to use this last-minute withdrawal of their legal defenses as another delay tactic, suggesting the trial was thus moot. But at the same time they had not turned over the at-issue books and records nor agreed to turn over the full scope of requested information, books and records. This forced the parties to go through the exercise of a complete trial in order to vindicate the Fund's post-removal contractual rights under the IMA.

the complaint. The Court of Chancery granted specific performance of section 7 of the IMA, compelling the turnover of all information, books and records in IGM's possession related to the Fund and its investments, as well as injunctive and declaratory relief. Defendants subsequently turned over approximately 650,000 documents that had been wrongly withheld.[9] A copy of the Court of Chancery's decision is attached hereto as <u>Exhibit M</u>.

### d. Summary Judgment on Retained Funds and Advancement

54.     On March 27, 2024, the Fund Parties filed a motion for partial summary judgment with respect to their affirmative claims to recover the Retained Funds (which at that point totaled more than $9.5 million), as well as to deny Defendants' Counterclaims for advancement.

55.     With respect to advancement, the Fund Parties sought entry of summary judgment denying the Counterclaims based on *non-ERISA defenses*, including (a) that the Foreclosure Litigation and the First Fund Action had concluded and should be addressed as indemnification claims rather than advancement, (b) that the First Fund Action and Chancery Action involved post-Removal conduct for which Defendants were not indemnified such that advancement was not permitted, and (c) that the First Fund Action and Chancery Action constituted internal disputes under the LPA for which Defendants were not indemnified such that advancement was not permitted.

56.     In their opening brief, the Fund Parties noted also the continuing implications of ERISA, but that because the ERISA defense could involve factual determinations as to Defendants' breaches of their ERISA fiduciary duties (including without limitation the fiduciary concerns noted in paragraph 46 above), the Fund Parties were not raising that for summary

---

[9]     For reference, Defendants initially only turned over approximately 100,000 documents. TREO GP was required to expend additional resources enforcing the judgment until Defendants eventually made what is now at least a near-complete turnover of information, books and records.

judgment purposes, though such defense was expressly reserved. A copy of the Fund Parties'
opening brief is attached hereto as Exhibit N.

57.     Only Delano cross-moved (the "Cross-Motion"), asking that summary judgment be
entered granting her personal Counterclaims for advancement.

58.     The Fund Parties opposed Delano's Cross-Motion, asserting that it should be
denied for the same reasons that summary judgment should be granted in the Fund Parties' favor,
but also that if such reasons were deemed insufficient, then TREO GP's ERISA defense had to be
considered.  In particular, TREO GP asserted that ERISA either provides a blanket prohibition
against advancement under Third Circuit case law or, at least, requires a factual determination as
to whether there had been breaches of ERISA fiduciary duties, which at least preclude an
affirmative award of summary judgment before such determinations could be made.  A copy of
the response to the Cross-Motion is attached hereto as Exhibit O.

59.     The parties presented oral argument on June 7, 2024. [10]  At the hearing, Defendants
offered no credible argument in support of their continued retention of the Retained Funds.  They
acknowledged, in response to questioning from the Court of Chancery, that they had no contractual
right to hold such funds, and instead relied on wholly inapplicable principles of equity.

60.     With respect to the ERISA defense to the advancement Counterclaims, at the
hearing the Court of Chancery for the first time (during Defendants' responsive argument) raised
the issue of whether the Court of Chancery had jurisdiction to rule on the applicability of ERISA
to the Counterclaims.  Despite that none of the Defendants had taken such a position in their briefs,
they argued that the Court of Chancery did not have subject matter jurisdiction.  In their rebuttal,
the Fund Parties asserted that the Court of Chancery *did* have subject matter jurisdiction, pointing

_____

[10]     A copy of the transcript from the June 7 hearing is attached hereto as Exhibit P.

expressly to this Court's prior remand ruling, in which this Court ruled that an ERISA affirmative defense was not a basis for removal and thus remanded the entire action, including the Counterclaims that were subject to the ERISA affirmative defense, back to the Court of Chancery. The Fund Parties argued at the hearing that remand would not have been appropriate if the remanded claims could not be adjudicated in the Court of Chancery.

61.     Following the hearing, and in an apparent attempt to avoid the Court of Chancery issuing another scathing ruling addressing their post-removal conduct, Defendants agreed to return the Retained Funds.  But they would not agree to entry of judgment finding that they had wrongly refused to return the Retained Funds in the first place, or to pay damages (i.e., at least pre-judgment interest), so the Retained Funds were turned over without prejudice to a ruling on the Fund Parties' motion for summary judgment as to all claims related to the Retained Funds other than the claim to recover possession.

62.     On August 26, 2024, the Court of Chancery delivered a bench ruling with respect to the Fund Parties' motion for summary judgment with respect to the Retained Funds.[11]  The Court of Chancery's August 26 bench ruling was replete with additional findings related to the Defendants' wrongful post-removal conduct and bad-faith litigation strategy, including:

- "[a]s set forth in the Court's April 17, 2024, post-trial letter decision, Defendants improperly withheld for months vast quantities of information to which TREO and the Fund were unequivocally and contractually entitled. Indeed, IGM has continued to produce documents to TREO and the Fund over the past several months that should have been produced in September, were promised to be produced in February, were ordered to be produced in April, and again promised to be produced in May."[12]

---

[11]     Transcript, Aug. 26, 2024. A copy of the transcript containing the August 26 bench ruling is attached hereto as Exhibit Q.

[12]     *Id*. at 22:22-23:7.

- "In other words, Defendants essentially concede that the governing documents of the Fund and its management relationships make no provision for a terminated manager to refuse to turn over assets of the Fund. Defendants' threadbare explanations for their actions has often left me scratching my head as to why, in a case involving sophisticated parties, this is even a dispute in the first place. I have frequently found myself trying to parse the meaning of arguments like the following from Defendants: '[e]ven if [the Fund] ha[s] right and title [to the Retained Funds], that doesn't mean [Defendants] improperly withheld it.'"[13]

- "Instead, upon their removal, Defendants seem to have determined to withhold millions of dollars of the Fund's money because... they believed withholding nearly $10 million of the Fund's money would give them leverage in any follow-on dispute."[14]

- "The Fund's business operates on timely investing money in opportunities as they arise. By withholding nearly $10 million for as long as they did, Defendants risked depriving the Fund and TREO of the opportunity to invest the funds in alternative investments - and indeed, they may have done exactly that. The Court enforces parties' bargained-for terms and rights. And here, the terminated investment managers tried to get something beyond what they bargained for. The Fund's information, money, and investments transferred, or at least should have transferred but for Defendants' improper withholding, to the Fund and its designated general partner and management investment firm nearly a year ago. Defendants can't identify a legal right to the contrary."[15]

- "Defendants' abrupt 180 [to hand over the Retained Funds on the precipice of an adverse ruling] resembles Defendants' change in position on the eve of trial in the information rights proceeding. In both the information rights matter and this Retained Funds matter, Defendants have taken questionable positions and fought vigorously to defend those positions up until the eve of trial, or in this case, a few weeks after the summary judgment hearing. Then Defendants drop their arguments at the last minute, purporting to moot the dispute. Yet in the following weeks, it becomes clear that Defendants viewed their concessions to have some strings attached that ultimately do not moot the issue. This type of litigation practice is a drain on both party and court resources. Hardly a strategy that embodies equity. Secondly, the notion that a properly replaced manager may simply withhold monies at its whim, without any contractual basis, seems far removed from reasonable

---

[13]    *Id*. at 15:14-16:2.

[14]    *Id*. at 20:18-24.

[15]    *Id.* at 22:1-16.

business expectations, much less equity. Frankly, it seems more akin to schoolyard rules, at best."[16]

63.    The Court of Chancery accordingly ruled that Defendants had no property interest in or right to retain the Retained Funds, and thus granted summary judgment for TREO GP.

64.    On September 9, 2024, the Court of Chancery delivered a separate bench ruling with respect to TREO GP's motion and Delano's cross-motion for summary judgment with respect to the advancement Counterclaims.[17]  With respect to advancement under the LPA, the Court of Chancery denied TREO GP's motion for summary judgment, relying exclusively on Delaware law and the Delaware Court of Chancery's policy in favor of fee advancement.  In particular, the Court of Chancery relied on Delaware's pro-advancement caselaw, which had not been cited by Defendants and so not briefed in response by the Fund Parties, to conclude that the LPA requires advancement even for the purely post-removal conduct at issue in the Chancery Action.

65.    In its bench ruling, the Court of Chancery also granted Delano's cross-motion, finding that Delano was entitled to advancement both from UnumX in her capacity as a former director, and from the Fund. But in reaching that decision, the Court of Chancery refused to consider TREO GP's affirmative ERISA defense for the Fund, instead only ruling on advancement "under Delaware law while leaving any ERISA questions for adjudication by the federal court, should the Counterclaim Defendants file an action for relief there."[18]

66.    In reaching its decision, the Court of Chancery did refer to this Court's remand decision, but focused on the findings that the *complaint* in that action did not assert claims under

---

[16]    *Id.* at 23:15-24:11.

[17]    *See* Exhibit A.

[18]    Transcript, Sept. 9, 2024, at 36:12-15.

ERISA, while not addressing the critical ruling that the ERISA *defense* to the Counterclaims was not a basis for removal.  The Court of Chancery instead focused on a footnote in the remand opinion, related to the potential for federal jurisdiction to arise if the complaint was amended to assert affirmative claims under ERISA, in support of its apparent conclusion that the continued or later assertion of the ERISA *defense* to the Counterclaim might divest the Court of Chancery of jurisdiction.

67.     The Court of Chancery did not explain in its bench ruling how it could determine, as it must to grant summary judgment, Delano's entitlement to judgment as a matter of law while an asserted defense had been raised but which remained unsettled.  Instead, the Court of Chancery stated that "I will thus enter my decision on the counterclaims solely as they relate to Delaware law.  Any questions as to the impact of ERISA are specifically preserved.  If those issues need to be litigated, the parties may do so in federal court."[19]

### e.  Motion for Reargument

68.     The Fund Parties filed a motion for reargument under Court of Chancery Rule 59(f) on September 16, 2024.  As relevant here, TREO GP asked the Court of Chancery to reconsider its apparent misinterpretation of this Court's remand ruling, as well as the irreconcilable rulings of preserving a defense on the one hand while finding that Delano was entitled to judgment as a matter of law on the other. A copy of the motion for reargument is attached hereto as <u>Exhibit R</u>.

69.     On November 15, 2024, the Court of Chancery issued its ruling on the motion for reargument, which granted the motion in part and denied it in part.[20]

---

[19]     *Id*. at 36:16-20.

[20]     <u>Exhibit A</u>.  While not relevant to this action, the Court of Chancery reversed one challenged aspect of the prior bench ruling, that UnumX was obligated to advance fees for the First Fund Action and the Chancery Action.

70.    The reargument ruling did not change the Court of Chancery's refusal to consider the ERISA defense to the Counterclaim, nor did it address the court's ability to grant summary judgment while an affirmative defense remained asserted and unresolved.

71.    In the Court of Chancery's comments to the ruling, the court acknowledged that it had "decided the matter under Delaware law and preserved ERISA questions for federal litigation, Movants' due process argument notwithstanding." The Court of Chancery did not explain what was meant by "preserving" the ERISA questions for federal litigation, or how to implement such preservation.  Moreover, the comments do not address how summary judgment could be granted while an asserted affirmative defense remained unsettled.

72.    Following the ruling on the motion for reargument, the Fund Parties submitted a proposed form of implementing order that preserved the ERISA defense.  Specifically, the Fund Parties proposed that implementation would be deferred until a federal court ruled on the ERISA defense (the relief requested in this complaint).  Delano objected and submitted a competing form of implementing order that would require immediate implementation and payment of fees by the Fund, without regard for the fact that the Court of Chancery had said that the ERISA defense would be "preserved . . . for federal litigation. . . ."

73.    On November 18, 2024, the Court of Chancery entered the form of implementing order submitted by Delano.  The court further confirmed at a status conference on November 20, 2024, that all aspects of the affirmative ERISA defense should be addressed by a federal court, including TREO GP's argument that the defense should be addressed before the bench ruling was implemented and funds were actually advanced.[21]

---

[21]    Transcript, Nov. 20, 2024.  A copy of the transcript is attached hereto as Exhibit S.

**Count I – Declaratory Relief**

74.     The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

75.     Investors in the Fund include ERISA plan assets.

76.     The Fund is an ERISA plan asset fund with a significant portion of its assets from qualified Benefit Plan Investors within the meaning of Section 3(42) of ERISA.  Thus, the Fund is governed by ERISA and its fiduciaries are subject to the strict fiduciary requirements imposed under ERISA.

77.     The Fund is also subject to ERISA because Delano, on behalf of IGM, signed an acknowledgment expressly accepting its status as a named ERISA fiduciary under Section 3(38) of ERISA by agreeing that IGM "has elected to manage the assets of [the Fund] as ERISA plan assets and as a QPAM. . . ."

78.     Delano, on behalf of IGM, accepted appointment "as an investment manager within the meaning of Section 3(38) of ERISA . . . ."

79.     Delano, on behalf of IGM, further acknowledged that "IGM will be acting as an ERISA fiduciary. . . ."

80.     Separate from their acceptance of ERISA duties based on their express acceptance as a named fiduciary, Defendants were ERISA fiduciaries because they possessed and exercised authority and control with respect to the management and disposition of ERISA plan assets.

81.     ERISA provides that "any provision in an agreement or an instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy." 29 U.S.C. § 1110(a).

82. The Department of Labor has interpreted this statute to "render[] void any arrangement for indemnification of a fiduciary of an employee benefit plan by the plan." 29 C.F.R. § 2509.75-4 (interpretive bulletin).

83. Defendants' conduct at issue in the Foreclosure Litigation, the First Fund Action and the Chancery Action constituted willful misconduct, in violation of the Defendants' fiduciary duties, including duties imposed under ERISA, and therefore constituted Disabling Conduct as defined in the LPA.

84. While the First Fund Action and the Chancery Action sought relief only as a result of Defendants' post-removal, per se not indemnifiable actions, Defendants' conduct both before and after removal reflects patent breaches of Defendants' fiduciary duties under ERISA, including (a) intercepting and retaining the UnumX Proceeds and the Tuesday Morning Proceeds, (b) causing the Fund to enter into prohibited conflicted transactions without LPAC consent, (c) diverting Fund resources and corporate opportunities to entities outside the Fund ownership structure, (d) incurring excessive and unreasonable fees, including for legal and consulting services, (e) breaching investment concentration limits, (f) causing the Fund to pay expenses unrelated to the Fund, and (g) failing to offset management fees by additional work fees received by IGM.

85. TREO GP is entitled to a declaration that ERISA prohibits the Fund from advancing fees to or for any of the Defendants to the extent they may have breached their ERISA fiduciary duties, which must be determined before any fees may be advanced.

## Count II – Declaratory Relief

86. The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

87.    For the reasons set forth above, the Fund contains ERISA plan assets and the Defendants were ERISA fiduciaries.

88.    ERISA prohibits the use of ERISA plan assets to advance legal fees for ERISA fiduciaries.

89.    TREO GP is entitled to a declaration that ERISA prohibits the Fund from advancing fees to or for any of the Defendants because the Fund is an ERISA plan and because the Defendants were ERISA fiduciaries.

### Count III – Declaratory Relief

90.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

91.    Defendants have failed to provide any assurance to the Fund about their ability to repay any amounts advanced.

92.    If advancement were otherwise permitted, ERISA prohibits an ERISA fiduciary, such as TREO GP, from using ERISA plan assets to advance an ERISA fiduciary's legal fees without adequate assurance that the party receiving such advancement has the ability to repay any amounts advanced, if later determined that the party was not entitled to indemnification.

93.    TREO GP is also entitled to a declaration that ERISA prohibits the Fund from advancing fees to or for any of the Defendants to the extent they have not provided adequate assurance of their ability to repay any amounts advanced.

### Count IV – Injunctive Relief

94.    The allegations contained in the above paragraphs are hereby incorporated by reference as if fully set forth herein.

95.    For the reasons set forth above, the Fund contains ERISA plan assets and the Defendants were ERISA fiduciaries.

96.    ERISA prohibits the Fund from advancing fees to or for any of the Defendants to the extent they may have breached their ERISA fiduciary duties, which must be determined before any fees may be advanced, or, in the alternative, prohibits the use of ERISA plan assets to advance legal fees for ERISA fiduciaries.

97.    If advancement were otherwise permitted, including under Delaware law, ERISA prohibits an ERISA fiduciary, such as TREO GP, from using ERISA plan assets to advance an ERISA fiduciary's legal fees.

98.    TREO GP is entitled to injunctive relief enjoining any payments by the Fund otherwise determined to be advanceable to or for the benefit of Defendants.

### PRAYER FOR RELIEF

WHEREFORE, TREO GP requests that this Court enter judgment against Defendants as follows:

(1) **ON COUNT I:**

    a.    declaring that ERISA prohibits the Fund from advancing fees to or for any of the Defendants to the extent they may have breached their ERISA fiduciary duties, which must be determined before any fees may be advanced;

(2) **ON COUNT II:**

    a.    declaring that ERISA prohibits the Fund from advancing fees to or for any of the Defendants because the Fund is an ERISA plan and because the Defendants were ERISA fiduciaries;

(3) **ON COUNT III:**

    a.    declaring that ERISA prohibits the Fund from advancing fees to or for any of the Defendants to the extent they have not provided adequate assurance of their ability to repay any amounts advanced;

(4) **ON COUNT IV:**

   a.  enjoining any payments by the Fund otherwise determined to be advanceable to or for the benefit of Defendants;

(5) for the TREO GP's attorneys' fees and costs; and

(6) for such other and further relief as the Court deems warranted.

DATED: November 20, 2024                    **DLA PIPER LLP (US)**

                                             /s/ Aaron S. Applebaum
                                             Ronald N. Brown, III (I.D. No. 4831)
                                             Aaron S. Applebaum (I.D. No. 5587)
                                             1201 North Market Street, Suite 2100
                                             Wilmington, DE 19801
                                             302.468.5700
                                             302.394.2341 (Fax)
                                             ronald.brown@us.dlapiper.com
                                             aaron.applebaum@us.dlapiper.com

                                             *Attorneys for TREO Vitus GP, LLC, for itself and as general partner for Invictus Special Situations Master I, L.P.*